# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ASHUR HIDOU,

   *Petitioner,*

  v.

NICHOLAS LAMB, Warden, Lawrence Correctional Center; and JOHN R. BALDWIN, Acting Director, Illinois Department of Corrections,

   *Respondents.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 17 C 6985

Judge Virginia M. Kendall

## MEMORANDUM OPINION AND ORDER

In 2010, a judge convicted Ashur Hidou of first-degree murder and accordingly sentenced him to 35 years in the Illinois Department of Corrections for stabbing Israel Moreno eight times in the back and chest. After an unsuccessful direct appeal and postconviction challenge in the Illinois state courts, he petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. 1). Hidou alleges that his state court conviction and sentence violate his rights under the Fifth, Sixth, and Fourteenth Amendments, raising seventeen distinct claims of ineffective assistance of counsel and three due process claims. Hidou also requests an evidentiary hearing. Because Hidou already had one bite at the apple in the state courts, and the resulting decisions are neither contrary to nor an unreasonable application of federal law, the Court denies his petition and request for an evidentiary hearing (Dkt. 1).

## BACKGROUND

When a federal habeas petitioner is in custody pursuant to a judgment of a state court, the federal court presumes the state court's factual findings are correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012). Because this was a bench trial, the judge acted as the finder of fact. The Court has reviewed the record and confirms that it supports the state court's factual findings. Therefore, the Court primarily draws the following facts from the Illinois Appellate Court's opinion on collateral review. *See People v. Hidou*, 1-14-3903, 2016 WL 5243931 (Ill. App. Ct. 2016) cert. denied 138 S.Ct. 198 (2017). The Court takes facts not mentioned in the opinion from the transcripts of the state court proceedings and from the court's opinion on direct appeal. *Id.*

## I.    Facts

Following a bench trial in the Circuit Court of Cook County, a judge convicted Hidou of first-degree murder and sentenced him to 35 years' imprisonment for the 2008 killing of Israel "Kiki" Moreno. *People v. Hidou*, at ¶ 4. Hidou and Moreno knew each other from living in the same neighborhood but were in rival gangs. *Id.* ¶¶ 4, 28. In the early morning of July 14, 2008, Hidou stabbed Moreno multiple times in the chest and back following an altercation in the street. Moreno died at the hospital later that night from his injuries. *Id.* ¶ 6.

## A.  Vanessa Claudio

Vanessa Claudio ("Vanessa") testified for the State at trial.  *Id.* ¶ 5.  On the night of July 13, 2008, Hidou was at the Claudio family home.  *Id.* ¶ 7.  Vanessa was 18 years old at the time and had previously dated both Hidou and Moreno.  Following her breakup with Hidou, the two remained close and Hidou often spent time "hang[ing] out" at the Claudio's.  *Id.* ¶ 6.  At approximately 5:00 p.m. on July 13, Hidou showed Vanessa and her parents a large knife that he had recently purchased. *Id.* ¶ 7.  A few hours later, more friends came to the residence.  *Id.*  Vanessa was in her bedroom with Hidou and a few others when she heard Moreno yelling for her from the street.  *Id.*  After Vanessa ignored him, she saw Moreno walk away with his friend, Gregory Latson.  *Id.*  She stated that Hidou "looked a little mad, but not really."  *Id.*

About 15 to 20 minutes later, Hidou announced he was leaving because his sister had arrived  to pick him up.  *Id.* ¶ 8.  As Hidou was walking out of the house, he told Vanessa's younger brother that he was going to talk to the guys that were "messing with" one of her brothers and was "going to get them."  *Id.*  After Hidou left the house, Vanessa heard people yelling and screaming in the street and ran outside. *Id.*  When she got outside, she saw Moreno lying in the street and heard Latson say, "[Hidou] has a knife," although she did not see it.  *Id.*  Moreno was pale, bleeding, and gasping for air.  *Id.*  When Vanessa eventually left Moreno's side and returned home, she saw Hidou in the laundry room of her apartment building.  *Id.* ¶ 9.  She stated he was "really bloody" and his eyes were swollen shut.  *Id.*

Vanessa also testified to previous violent encounters with Moreno, including an incident that took place a week before his death. *Id.* ¶ 10. Moreno had become angry when she tried to ignore him after he called her name and he responded by grabbing her face. *Id.* Her father and brothers became involved, but Moreno kept trying to get in the building and was "hitting everyone." *Id.* Vanessa testified that she unsuccessfully tried to hold him back, but he hit her mother's friend, who fainted. *Id.* The police arrived and arrested Moreno. *Id.*

### B.    Gregory Latson

Latson, Moreno's best friend, also testified for the State. *Id.* ¶ 11. He testified that on the night of June 13th, 2008, he and Moreno had been at Moreno's home drinking beer from about 10:30 p.m. to 2:00 a.m. *Id.* ¶ 11. At about 2:00 a.m. on June 14th, Latson and Moreno went for a walk and ended up across the street from Vanessa's apartment. *Id.* Latson testified that Moreno had yelled for Vanessa, but when she did not respond, the two of them started to walk away. *Id.* ¶¶ 11–12. Moreno stopped and said, "Well, who is this walking in the middle of the street?" *Id.* ¶ 12. When Latson turned toward a man dressed in black whom he had never seen before, Moreno said, "Oh, it's just Ashur." *Id.* ¶ 12. Latson and Moreno kept walking, but then heard Hidou say, "What's up, bitch?" as he quickly closed the distance between himself and Moreno. *Id.*

Latson saw Hidou pull out a large knife at the same time Moreno swung an arm toward him. *Id.* ¶ 13. Latson saw Hidou stab Moreno on his left side, after which

the two of them fell backwards and collapsed on the ground. *Id.* Hidou was on the bottom stabbing Moreno, who was on top "flailing his arms." *Id.* Latson estimated that Hidou stabbed Moreno five or six times. *Id.* Latson grabbed Hidou and tried to get the knife out of his hands, then started kneeing Hidou in the face as Moreno got up and tried to walk away. *Id.* ¶ 14. Moreno testified that he heard Hidou yell "king love," which signaled allegiance to the Latin Kings gang. *Id.* ¶¶ 14, 22. As Hidou and Latson struggled over the knife, the blade cut Hidou's hand. *Id.* ¶ 14. Soon after, Latson testified that Vanessa and her father arrived on the scene, saw Moreno profusely bleeding, which prompted Vanessa to yell, "Oh my God, Kiki's dying." *Id.* ¶ 15.

### C.     Ray Maldonado

Ray Maldonado was another witness for the State. *Id.* ¶ 16. He was best friends with one of Vanessa's brothers and had been drinking at a separate party earlier in the night but ended up back at the Claudio home. *Id.* He was in Vanessa's bedroom with her when they saw Moreno and Latson walking in the street and heard Moreno yell for Vanessa. *Id.* He testified that, at that time, he also observed Hidou in the street, first walking in the opposite direction of Moreno and Latson but then noticed Hidou switch directions. *Id.* Maldonado did not see the beginning of the fight but ran outside after he heard the scuffle and saw Moreno collapsed on the ground with "his insides hanging out." *Id.* Maldonado's sisters came to pick him up and they even offered to take Hidou to the hospital, but Hidou told them he could not go, so they took him home to see his mother. *Id.* ¶ 17.

### D.      The Claudio Family

Vanessa's mother testified for the defense, stating that her whole family feared Moreno because he was always threating them. *Id.* ¶ 18. Vanessa's brother, Anthony, also testified for the defense about Moreno's violent tendencies. *Id.* ¶ 19. His testimony about the stabbing and the circumstances surrounding it was consistent with that of the State's witnesses. *Id.* ¶ 19. He added that Hidou had previously told him he was a member of the Latin Kings and that he heard Hidou yell "king love" after the stabbing. *Id.* ¶ 19. Vanessa's father, Angelo, also testified for the defense. *Id.* ¶ 21. While he affirmed the rest of the family's testimony that Moreno had been tormenting them, he also said that he heard Hidou yelling "Kiki, I hope you die," during the struggle between Hidou and Moreno. *Id.* at 21.


### E.      Ashur Hidou

Hidou took the stand and testified on his own behalf. *Id.* ¶ 22. He admitted that he had a knife that he had shown to the Claudio family on the night of July 13, 2008. *Id.* He denied that he was a member of the Latin Kings gang and denied knowing what "king love" meant, but admitted he had some "good friends" who were Latin Kings. *Id.* Hidou testified that on the night of the incident he left the Claudio home because his sister was going to pick him up. *Id.* ¶ 23. When he got outside and did not see his sister, he started walking towards a convenience store so that his sister could pick him up there instead. *Id.*

According to Hidou, as he was walking to the convenience store, he saw Moreno with Latson and was afraid that they would kill him. *Id.* ¶ 24. As he was looking back and forth at Latson and Moreno during the altercation, he described that "it all happened so fast." *Id.* He testified that Moreno trapped him, so he could not run or hit him; then, he was "grabbed from behind" and "slammed" to the ground. *Id.* Hidou blacked out for some part of the incident, but remembers getting hit in the face, dragged, kicked, and punched. *Id.* He pulled out his knife to get Moreno and Latson off him, then he "just started swinging [his knife] wildly." *Id.* Hidou testified that there was a struggle for the blade as it came close to his chest and stomach. *Id.*

Hidou's testimony about the period after the stabbing aligned with that of the State's witnesses. *See id.* ¶ 25. He admitted that he did not see Moreno with any weapons. *Id.* He testified that, after the altercation, he did not stay to tell the police that he had been defending himself, but instead left the area with his friends. *Id.* He also confirmed that he did not make any efforts to call the police after he stabbed Moreno. *Id.*

### F.     Dr. Ron and Dr. Jones

Dr. Ron treated Hidou's injuries from the fight. *Id.* ¶ 26. The parties stipulated that, if called to testify, Dr. Ron would state that when Hidou arrived at the hospital, he gave the name "Ashy Hidy," a birth date of July 3, 1989,[1] and told the doctor that he had been "jumped." *Id.* The stipulation also described Hidou's injuries

---

[1] This was not Hidou's actual birthdate.

as they had been diagnosed at the hospital. *Id.* The parties stipulated that Dr. Tera Jones was an expert in forensic pathology and performed the autopsy on Moreno. (Dkt. 6 at 290.) Dr. Jones's testified at trial that Moreno had three stab wounds to his chest and abdomen and five stab wounds in the back. *Id.* at 291. Dr. Jones's concluded that Moreno's cause of death was multiple stab wounds. *Id.* at 308.

The court found Hidou guilty of first-degree murder. *People v. Hidou*, at ¶ 28. In so finding, the court determined that Hidou was not credible, but that the State's witnesses were. The court emphasized that the stabbing had not been merely a gang rivalry, but instead was "very personal" between Moreno and Hidou. *Id.* Finally, the court noted that it understood that it could have find Hidou guilty of second-degree murder but asserted that the facts merited a finding of first-degree murder instead. *Id.*

## II.    Procedural History

Following his conviction for two counts of first-degree murder, Hidou hired new counsel to represent him in the sentencing, direct appeal, and postconviction proceedings. *Id.* ¶ 29. After the trial judge sentenced him to thirty-five years in the Illinois Department of Corrections, Hidou filed a post-trial motion asserting that his trial attorney did not effectively assist him in defending his case. *Id.* The court denied the motion. *Id.*

## A.    Direct Appeal

Hidou appealed his convictions, arguing that: (1) the evidence was insufficient for first-degree murder; (2) the trial court violated his rights to a fair trial and due process because it failed to consider the offense of second-degree murder; and (3) trial counsel was ineffective.[2]  *Id.* ¶ 30; Dkt. 5 at 4–54.  To support his ineffective assistance claim, Hidou contended that his counsel failed to: (1) appreciate the distinction between first-degree murder, second-degree murder, and self-defense; (2) properly move to admit evidence of Moreno's propensity for violence; (3) effectively cross examine witnesses, including Latson; (4) object to improper witness evaluation and irrelevant evidence, including testimony from Dr. Tera Jones; (5) stipulate to Hidou's use of false information at the hospital; (6) prepare witnesses to testify; and (7) preserve the record regarding "tension and animosity" in the courtroom.  Id. ¶ 30; Dkt. 5 at 4–54.

The Illinois Appellate Court affirmed Hidou's conviction.  Id. at ¶ 30.  The court noted that the decision to pursue a certain theory of defense is a reasonable trial strategy and that nothing in the record showed that counsel was unaware of the distinctions between first-degree murder, second-degree murder, and self-defense.  *Id.* The appellate court also pointed to the trial court's statement that it "was cognizant of the fact that [it] could find defendant guilty of second-degree murder" but felt that

---

[2] Hidou also argued that the trial court violated the one-act-one-crime doctrine by entering two convictions for first degree murder based on the same act.  The Illinois Appellate Court agreed and modified the judgement to reflect Hidou's single conviction for first-degree murder while rejecting defendant's request for remand and resentencing.  2013 IL APP (1st) 103511-U at ¶ 73.

first-degree murder was appropriate after considering the evidence. *Id.* Further, the court found that substantial evidence demonstrated Moreno's propensity for violence, and that the decision not to cross-examine Latson was reasonable trial strategy. *Id.* Finally, the appellate court did not view the stipulation regarding Dr. Tera Jones as deficient representation, given that she was qualified to give her opinions and the trial court would have overruled any objection. *Id.*

### B. Collateral Attack

Hidou subsequently filed a petition for postconviction relief under 725 ILCS 5/122-1, contending that counsel was ineffective for: (1) failing to conduct any investigation to discover additional witnesses and present those witnesses at trial, 2016 IL App (1st) 143903-U at ¶ 39; (2) stipulating to Dr. Ron's Testimony, *id.* ¶ 59; (3) failing to challenge Dr. Jones's opinion as to cause of death, *id.* ¶ 61; (4) failing to object to evidence of gang involvement, *id.* ¶ 64; (5) failing to investigate all legal defenses, including a theory of second-degree murder, *id.* ¶ 66; (6) failing to review discovery with defendant, *id.* ¶ 68; (7) failing to communicate with the defendant and prepare him for trial, *id.* ¶ 70; (8) coercing the defendant into choosing a bench trial, *id.* ¶ 72; (9) charging excessive fees in proportion to counsel's deficient level of representation, *id.* ¶ 74; and (10) advising the defendant to falsely testify, *id.* ¶ 76. Furthermore, Hidou alleged that his rights to due process and a fair trial were violated because gang members watched the trial to intimidate and influence vital witnesses. *Id.* ¶ 79.

The trial court found that each of Hidou's claims failed because of res judicata, were not supported by the necessary affidavits, or qualified as reasonable trial strategy in dismissing his postconviction petition without an evidentiary hearing. *People v. Hidou*, at ¶ 31, 35; Dkt. 5 at 601. The Illinois Appellate Court affirmed, agreeing that calling witnesses, cross-examination, and impeachment were all matters of trial strategy that did not support Hidou's assertion that his counsel was ineffective for failing to investigate or discover additional witnesses and present them at trial. *Id.* ¶¶ 40, 82. The court also noted that Hidou failed to demonstrate prejudice arising from his counsel's decision not to call certain witnesses because none of the proposed witnesses could negate the "overwhelming evidence to convict defendant of first-degree murder," nor change the outcome of the trial. *Id.* ¶ 57.

The appellate court evaluated each of the alleged ineffective assistance claims and found each claimed deficiency was reasonable trial strategy, nonprejudicial to Hidou, or both. Specifically, in considering the trial attorney's stipulation to Dr. Ron's Testimony, the appellate court reasoned that because the stipulation related only to the information in the hospital's medical report from the night of the stabbing, even if counsel had called its own doctor to introduce an alternative medical opinion about Hidou's injuries, this would not have changed the outcome of the trial and therefore did not establish ineffective assistance. *Id.* ¶ 60.

Turning to Hidou's claim that counsel was ineffective for failing to challenge Dr. Jones's opinion as to the cause of death, the court explained that the evidence supported a finding that Hidou's actions (stabbing Moreno eight times) were likely to

cause death, did in fact cause Moreno's death, and Hidou did not present enough evidence in his postconviction petition to rebut this finding. *Id.* ¶ 63. As to Hidou's claim that counsel failed to object to evidence that defendant was involved in a gang, the court viewed this choice as a reasonable trial strategy, attempting to minimize the evidence of gang affiliation instead of highlighting it with an objection. *Id.* ¶ 65. Moreover, the appellate court found that it did not impact the outcome of the trial because the trial court specifically concluded that the fight was motivated more by personal reasons than gang affiliation. *Id.*

The court subsequently asserted that counsel's decision to pursue an "all-or-nothing" defense that Moreno was the first aggressor instead of pursuing a theory of second-degree murder was reasonable trial strategy, thus rejecting Hidou's claim that counsel was ineffective for failing to investigate all legal defenses. *Id.* ¶ 67. The court also classified counsel's decision not to review discovery with Hidou as a matter of trial strategy within counsel's discretion and accordingly dismissed that claim. *Id.* ¶ 69. When considering Hidou's claims that his trial counsel failed to communicate with him, the appellate court looked to the record, which rebutted that assertion and revealed that counsel did, in fact, meet with him on several occasions. *Id.* ¶ 71. The appellate court next considered Hidou's contention that counsel coerced him into choosing a bench trial, explaining that the record not only shows that Hidou voluntarily waived his right to a jury trial, but such a decision is generally a matter of trial strategy not indicative of deficient representation. *Id.* ¶ 73.

Hidou asserted that counsel was ineffective because the deficient level of representation was not proportionate to the significant amount of money Hidou had paid for counsel. *Id.* ¶ 75. The appellate court stressed that Hidou offered no legal support for the proposition that excessive legal fees amount to a constitutional violation, and that the claim did not pertain to the "effect counsel's assistance had on defendant's ability to have a fair trial" as required to show ineffective assistance. *Id.* The court rejected Hidou's final ineffective assistance of counsel claim—that his trial counsel advised him to falsify his testimony—by pointing out that there was nothing in the record to support it and explaining "the fact that defendant was young and scared does not absolve him from his obligation to testify truthfully." *Id.* ¶ 77. Finally, after analyzing Hidou's sole due process claim that he was denied a fair trial because gang members intimidated vital witnesses during the trial, the court found nothing in the record to suggest that gang members inappropriately influenced the trial court and thus rejected the claim. *Id.* ¶ 79.

Hidou petitioned for rehearing and the court denied the request. (Dkt 5 at 892.) He subsequently petitioned the Illinois Supreme Court for leave to appeal ("PLA"). Hidou maintained that counsel's excessive fees created a conflict of interest and violated the duty of loyalty (Dkt. 5 at 929) and that counsel was ineffective for: (1) stipulating to inaccurate information related to Hidou's injuries and the cause of Moreno's death; (2) failing to investigate medical issues or consult with a medical expert; (3) stipulating to medical examiner Dr. Jones's qualifications; (4) stipulating to petitioner's use of false information at the hospital and failing to call petitioner's

cousin George Nisan to testify that he, not petitioner, provided the false information; (5) failing to hire an investigator and conduct an investigation; (6) failing to call Hidou's sister and other witnesses to corroborate petitioner's testimony; (7) failing to call Hidou's sister to testify that she purchased the knife used to kill Moreno; (8) failing to call a friend who had been at the Claudio residence that night; (9) failing to call purported eyewitness Philip Rangel; and (9) failing to properly impeach Maldonado.

The Illinois Supreme Court denied the PLA. (Dkt. 5 at 926–35.) Hidou petitioned the Supreme Court of the United States for a writ of certiorari, which the Court denied on October 2, 2017. *Hidou v. Illinois*, 138 S. Ct 198 (2017). Hidou timely petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254 and requested an evidentiary hearing.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs judicial review of state habeas petitions. It permits a federal court to issue a writ of habeas corpus only if the state court reached a decision on the merits of a claim, and that decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if its conclusion on a question of law violates Supreme Court precedent or if the facts of the

case are "materially indistinguishable" from a relevant Supreme Court opinion but the state court reaches the opposite result. *Weaver v. Nicholson*, 892 F.3d 878, 882 (7th Cir. 2018) (quoting *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000)). A state court "unreasonably applies" clearly established law if "the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision rests on an unreasonable factual determination when "the state court determined an underlying factual issue against the clear and convincing weight of the evidence." *Id.* (quoting *Morgan v. Hardy*, 662 F.3d 790, 798 (7th Cir. 2011)). To meet this standard, a petitioner must show that the state court's ruling was so "lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Ward v. Neal*, 835 F.3d 698, 703 (7th Cir. 2016) (internal citation omitted). A state court's decision is reasonable so long as fair-minded jurists could disagree on the correct outcome. *Weaver*, 892 F.3d at 883.

Under the AEDPA, the federal court's analysis involves a "straightforward inquiry" when the last state court to decide a prisoner's claim explains its decision on the merits in a reasoned opinion. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to [them] if they are reasonable." *Id.* In Hidou's case, the Illinois Appellate Court last addressed the merits of his claims in its denial of his

postconviction petitions. *See Illinois v. Hidou*, 2016 IL App (1st) 143903-U; *see also* 2013 IL App (1st) 103511-U.

Most of Hidou's claims allege violations of his Sixth Amendment right to effective assistance of counsel. Under the familiar *Strickland* formula for evaluating such claims, Hidou bears the burden of showing that his trial counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Specifically, Hidou must establish that counsel's performance was deficient, and that the deficiency prejudiced his defense. *Id.* at 697.

The first step for a court to take in this framework is to ask "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Harper v. Brown*, 865 F.3d 857, 860 (7th Cir. 2017) (quoting *Strickland*, 466 U.S. at 690). The second step is to assess prejudice, asking whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 860–61 (quoting *Strickland,* 466 U.S. at 694). This is not an easy standard to satisfy, as "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

If a petitioner fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other one. *See United States v. Taylor*, 569 F.3d 742, 748 (7th Cir. 2009) ("Courts may deny ineffective assistance of counsel clams for lack of prejudice without ever considering the question of counsel's actual

performance."). The AEDPA's highly deferential standard of review, combined with *Strickland*'s presumption that counsel acted reasonably, means this Court's review is "doubly deferential" to the state court's decisions on the ineffective assistance claims. *Lee v Avila*, 871 F.3d 565, 571 (7th Cir. 2017).

## ANALYSIS

Hidou raises claims under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. He first argues that he did not receive effective assistance of counsel at trial and raises seventeen distinct claims, most with multiple parts, to demonstrate this constitutional violation. Hidou also contends that he was denied due process of law and was deprived of a fair trial under the Fourteenth Amendment due to the intimidating courtroom atmosphere, the insufficiency of the evidence for first-degree murder, and because the trial court failed to consider second-degree murder. Before obtaining a merits review of a habeas claim, a state prisoner must first clear the "high hurdle" of procedural default. *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016). Given that Hidou's petition includes twenty separate claims, the Court begins its analysis by examining the two distinct ways a state prisoner can procedurally default a federal claim: failure to exhaust state court remedies or when the state court decision rests on independent and adequate state grounds.

# I. Procedural Default

First, the exhaustion of state court remedies requirement preserves judicial comity between federal and state courts by giving state courts the first opportunity to address and correct potential violations of a prisoner's federal rights. *Perruquet v Briley,* 390 F. 3d 515, 514 (7th Cir. 2004). The exhaustion doctrine requires a state prisoner to "fairly present" the federal issue to state courts for review by giving them one full opportunity to act on his claims before he presents those claims to a federal court in a habeas petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). A "full opportunity" means one complete round of review and may occur either on direct review or in postconviction proceedings. *McGee v. Watson*, 900 F.3d 849, 854 (7th Cir. 2018). In Illinois, the state prisoner must raise the claim in a petition for leave to appeal to the Illinois Supreme Court. *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018), *cert. denied sub nom. Snow v. Nicholson*, 138 S. Ct. 2637 (2018).

The second path to procedural default comes from the independent and adequate state ground doctrine. *See Coleman v. Thompson,* 501 U.S. 722, 729–30 (1991). In the context of federal habeas corpus, the doctrine bars review if the state courts declined to address a petitioner's federal claims because the petitioner did not satisfy his state procedural obligations. *Id.* In such cases, because the state court's judgment rests on a ground that is both independent of the federal question and adequate to support the judgment, federal habeas review of the claim is foreclosed. *Carter v. Douma*, 796 F.3d 726, 733 (7th Cir. 2015) (quoting *Kacmarek v. Rednour*, 627 F.3d

586, 591 (7th Cir. 2010)). As with exhaustion, principles of comity and federalism counsel against upending the state court conviction. *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016) (citing *Coleman*, 501 U.S. at 730).

Federal courts will not review a procedurally defaulted claim unless the petitioner can demonstrate one of either two exceptions: cause for and actual prejudice stemming from that default, or, alternatively, that the denial of relief will result in a miscarriage of justice. *Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016). To show "cause," the petitioner must show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule and properly raise the claim in state court. *Davilia v. Davis,* 137 S. Ct. 2058, 2065 (2017) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). The miscarriage of justice exception "applies only in the rare case where the petitioner can prove that he is actually innocent of the crime which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013). To meet that standard, he must demonstrate that in considering new, reliable evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. *Calloway*, 842 F.3d at 461.

Hidou asserts a total of twenty claims—seventeen for ineffective assistance of counsel and three under due process. For ease of reference, the Court adopts Hidou's numerical labels and language for each of his twenty claims. Hidou procedurally defaulted the following thirteen claims: ineffective assistance based on an impermissible financial conflict of interest that violated counsel's duty of loyalty to Hidou (Claim 1); failure to conduct any investigation and failure to interview, subpoena and

present testimony from potential eye-witness, Philip Rangel (Claim 7); presentation of an incompetent witness who was under the influence of marijuana when he testified (Claim 8); failure to prepare all defense witnesses to testify, including Hidou (Claim 9); failure to communicate with Hidou about his decisions, the evidence against him, all possible defenses, and any plea negotiations or plea bargain (Claim 10); coercing Hidou into waiving his right to a jury trial (Claim 11); failure to object or move *in limine* to preclude the state's use of irrelevant and prejudicial gang evidence (Claim 12); failure to investigate all legal defenses, understand the relevant law and to present evidence to support and argue for second degree murder (Claim 13); failure to confront and cross-examine Greg Latson, to introduce evidence of his character for violence and gang affiliation and to subpoena witnesses and impeach him (Claim 14); failure to confront, cross-examine and impeach Vanessa Claudio and failure to rehabilitate her about prior statements to the prosecution team (Claim 16); the intimidating court room atmosphere, disruption and significant security problems undermined the integrity of the trial and deprived Hidou of a fair trial (Claim 18); insufficiency of the evidence for first-degree murder (Claim 19); and the trial court improperly failed to make findings on second degree murder and ignored all evidence that supported a conviction for that offense (Claim 20).

## A.    Ineffective Assistance Based on Financial Conflict (Claim 1)

Throughout the postconviction phase of this case, Hidou has made clear to the courts that he believes his trial attorney charged excessive fees and did not

adequately use those fees to pay for trial-related expenses. But the exact nature of this claim has morphed along the way, leaving a confusing trail of arguments and altered assertions. Starting with his direct appeal, Hidou made no mention of this claim at all. In his postconviction petition, Hidou did not raise the issue of excessive attorney's fees as a freestanding allegation, rather only in connection to other ineffective assistance claims like failure to hire expert witnesses and failure to investigate potential leads. He made no mention of a conflict of interest in relation to attorney's fees.

In his postconviction appeal, Hidou again failed to raise the issue of a potential conflict of interest in connection with the fees, arguing merely that the fees should inform the court's analysis of counsel's deficient representation. To this point, the appellate court responded by noting: "Constitutional violations alleged in a postconviction petition must pertain to the effect counsel's assistance had on defendant's ability to have a fair trial. The legal fees do not impact defendant's right to a fair trial." *People v. Hidou*, 2016 IL. App (1st) 143903-U ¶ 75. It was not until the petition for rehearing that Hidou reframed the issue and argued to the Illinois Appellate Court that excessive legal fees are evidence of an attorney's conflict of interest. (Dkt. 5 at 894.) The appellate court denied the petition. Finally, in his PLA to the Illinois Supreme Court, Hidou essentially acknowledged that he lacked legal support for this claim by asking the Court to "determine whether the amount of legal fees charged in a criminal case can create a conflict of interest that serves as the basis for an

ineffective assistance of counsel claim." (Dkt. 5 at 929.) The Illinois Supreme Court denied his PLA.

Hidou procedurally defaulted his first claim because he did not fairly present the conflict issue to the state courts for review. Fair presentment requires a petitioner to put forward both the operative facts and the controlling legal principles in a manner that would sufficiently alert the state court to the issue. *Sweeney v. Carter*, 361 F.3d 327, 333 (7th Cir. 2004). While a petitioner may reformulate his claims throughout the postconviction process, the substance and underlying theory must remain the same. *Chambers v. McCaughtry,* 264 F.3d 732, 738 (7th Cir. 2001). Additionally, a petitioner does not fully and fairly present a federal claim to the state courts when he raises that claim for the first time in a petition for rehearing before the state appellate court or in a petition asking the state supreme court for leave to appeal. *Lewis v. Sternes*, 390 F.3d 1019, 1031 (7th Cir. 2004).

Here, although Hidou asserted that his trial attorney charged high fees, he failed to demonstrate a clear and consistent legal principle linking those fees to any constitutional challenge of ineffective assistance of counsel. The underlying theory of his legal claim changed every step of the way, eventually transforming into an unsubstantiated contention that high attorney fees create a conflict of interest because "trial counsel prioritized their own desire to generate revenue for themselves, as opposed to allocating that money towards anything that needed to be done to defend the case." (Dkt. 5 at 896.) It should go without saying that that nearly all attorneys have a goal of generating revenue to stay in business and that Hidou was free

to seek less expensive counsel.  Notwithstanding that, Hidou presented this illogical claim for the first time in his petition for rehearing, which was much too late to give the state courts a fair chance to rule on its merits.  Hidou therefore failed to exhaust Claim 1, which precludes this Court's review.

### B.    Ineffective Assistance and Due Process (Claims 8–14, 16, 18–20)

Out of the twenty claims that Hidou raised in his petition for habeas corpus, he procedurally defaulted eleven by failing to raise them in the state supreme court. Hidou acknowledges that he did not present claims 8–14, 16, and 18–20 in his PLA to the Illinois Supreme Court, thus failing to exhaust his state court remedies.  He argues, however, that the cause and prejudice exception should apply here, because "from a practical standpoint and merits standpoint," he simply could not raise all these claims in the twenty pages allotted by court rules.  (Dkt. 32 at 19.)  This excuse is without merit considering that "the fact that the Illinois Supreme Court rule limits the number of pages in a petition for leave to appeal does not excuse a petition from the requirement." *Snow,* 880 F.3d at 865.  Given that it is not enough to generally allege ineffective assistance of counsel, *see McGee v. Watson*, 900 F.3d 849, 854 (7th Cir. 2018), Hidou's tactical decision to articulate just nine of his seventeen claims in the PLA proves fatal for the other eight.  Moreover, Hidou made no mention of his three due process claims in his PLA.  As there is no valid external factor at play that impeded Hidou from properly raising these claims in state court, Hidou cannot establish the requisite cause.

Hidou also unsuccessfully argues that, despite the procedural default, the Court can consider the merits of the eleven claims because the miscarriage of justice exception applies. In view of the objectives behind procedural default—judicial comity and respectful relations between the state and federal courts—the Court defers to and agrees with the state appellate court's finding that any new, proposed evidence proffered by Hidou would still not negate the trial court's findings or change the outcome of the case. *People v. Hidou*, 2016 Il. App (1st) 143903-U ¶ 57. Because this is not the "rare case" where the petitioner has demonstrated "actual innocence" through new information not available on direct review, the miscarriage of justice exception is inapplicable. *See McDowell*, 737 F.3d at 483.

### C.    Ineffective Assistance Claim 7

The State next argues that Hidou procedurally defaulted Claim 7 because the state court rejected it on independent and adequate state law grounds. Claim 7, as mentioned above, alleges that trial counsel was ineffective for failing to investigate and call purported eyewitness Philip Rangel. Specifically, Hidou asserts that Rangel would have testified that Latson and Moreno both beat Hidou during the altercation, showing that he acted in self-defense. The state appellate court rejected this argument because Hidou failed to attach a supporting affidavit from Rangel to his postconviction petition in violation of Illinois's affidavit rule. *People v. Hidou*, 2016 IL. App (1st) 143903-U ¶ 55; *see Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012).

The affidavit rule, established by state statute and regularly followed by the Illinois Courts, establishes that a petitioner in postconviction proceedings must include "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2; *see Thompkins*, 698 F.3d 976. Hidou argues that, contrary to the appellate court's finding, he did comply with the affidavit rule because he explained how the absence of an affidavit was due to the ineffective assistance of counsel. (Dkt. 32 at 10–11.) Under that theory, Hidou set forth two contradictory explanations for his inability to include an affidavit from Rangel: trial counsel either (1) scared him off; or (2) never approached him in the first place, making him "effectively unavailable for any purpose." *Id.* at 11.

Notably absent from the postconviction petition, however, was any explanation why Hidou's newly-hired counsel, who took over the case after the trial, was unable to take steps to locate Rangel and obtain the requisite affidavit from him.[3] The affidavit rule calls for the petitioner to include a statement explaining why affidavits are unavailable, not to generally allege perceived missteps by trial counsel. On postconviction review, the state appellate court noted the absence of a sufficient explanation and found the lack of an affidavit "fatal." *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 55 (quoting *People v. Delton*, 882 N.E.2d 516, 520 (Ill. 2008)).

---

[3] Hidou does argue in his habeas petition that postconviction counsel and a "postconviction investigator" tried to locate Rangel to procure an affidavit from him. But Hidou did not include this explanation in the postconviction petition itself, which was the basis for the state court's decision on the affidavit rule. Raising the requisite explanation for the first time in a federal petition for habeas corpus does nothing to correct the misstep in state proceedings.

Hidou also looks for support in *Harris v. Reed*, which holds that procedural default based on "independent and adequate state grounds" will only apply where the last state court rendering a judgment in a case "clearly and expressly states" that its judgment rests on a state procedural bar. *Harris v Reed*, 489 U.S. 255, 263 (1989). He argues that the appellate court rejected his claim involving Rangel on both substantive *and* procedural grounds, making procedural default inappropriate.

Hidou is correct that the appellate court engaged in a broad discussion of the substantive merits of this claim when it considered the "numerous allegations of ineffective assistance that involve trial counsel's alleged failure to conduct an investigation to discover additional witnesses and present these witnesses at trial." *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 40. The state court noted that, in general, the decision whether to call a witness is a matter of trial strategy that does not give rise to an ineffective assistance claim under the Constitution. *Id.* The court, however, continued its analysis by examining each of the six "additional witnesses" who failed to testify and made individualized determinations on the fate of each claim. *Id.* ¶¶ 41–55. In its analysis of Philip Rangel, the state court "clearly and expressly stated" that the claim failed because it was not supported by an affidavit demonstrating Rangel's proposed testimony. *Id.* ¶ 55; *see Harris*, 489 U.S. at 263. Therefore, Hidou procedurally defaulted Claim 7 based on the independent and adequate state grounds doctrine.

Even if Claim 7 is procedurally defaulted, Hidou contends that federal review of the claim's merits is still appropriate because both exceptions to procedural default

apply. Turning first to the "cause and prejudice" exception, Hidou failed to identify any viable external factor that impeded counsel's efforts to comply with the state's procedural rule. Hidou should have known the requirements of the affidavit rule and could have complied with the law by clearly explaining his present counsel's efforts to locate Rangel, but he did not. Such negligence on the part of a prisoner's postconviction attorney does not qualify as cause for the procedural default of a federal habeas claim. *Maples v. Thomas*, 565 U.S. 266, 280 (2012). Additionally, without a reliable affidavit establishing what Rangel could have or would have testified to, it is impossible to know the extent to which Hidou was prejudiced by Rangel's absence at trial.

This raises a similar issue concerning the miscarriage of justice exception: without an affidavit from Rangel, the Court could not possibly conclude that it is more likely than not that, after hearing Rangel testify, no reasonable juror would have found Hidou guilty beyond a reasonable doubt. Moreover, even if Rangel had been available for trial and had testified that Moreno and Latson beat Hidou, that still would not be enough to establish "actual innocence." The state appellate court reaffirmed its finding from direct appeal that there was "overwhelming evidence to convict the defendant of first-degree murder." 2016 IL App (1st) 143903-U ¶ 57. Therefore, because neither of the exceptions apply, Hidou procedurally defaulted Claim 7, barring this Court's review.

## II.	Merits

Moving to the merits, seven claims remain, including: failure to investigate medical issues, retain an expert witness and present material and exculpatory expert testimony regarding Hidou's injuries and that the paramedics asphyxiated Moreno on the way to the hospital (Claim 2); stipulating to false and misleading information regarding Hidou's injuries and ineffective confrontation and impeachment of the state's evidence about his injuries (Claim 3); failure to investigate and challenge the qualifications and opinion of Dr. Tera Jones and the evidence admitted by the state through her testimony (Claim 4); stipulating to false and misleading information that was incriminating evidence about statements allegedly made by Hidou despite knowing this information was not true (Claim 5); failing to subpoena and present exculpatory evidence in counsel's possession that would have corroborated Hidou's testimony (Claim 6); failing to effectively confront and cross-examine Ray Maldonado to attack his character for violence and to subpoena and present impeachment witnesses (Claim 15); and intimidating vital defense witnesses with exculpatory information (Claim 17).

Some aspects of those claims, however, Hidou forfeited by failing to raise them in his opening brief. In his original petition, Hidou simply argued that each of his claims violated his Sixth Amendment rights and explained in detail why his counsel was allegedly ineffective. The Court assumes that Hidou targeted these arguments towards his motion for an evidentiary hearing under § 2254(e)(2), rather than his petition for a writ of habeas corpus under § 2254(d), because Hidou stated as much

in his petition: instead of using his seventy-page petition to argue for an evidentiary

hearing *and* outline his bases for relief under the AEDPA, Hidou attempted to reserve

half of his argument for the reply brief. [4]  As a result, Hidou did not address either

prong of § 2254(d) in his initial petition and did not explain if and to what extent the

Illinois Appellate Court's decision was either contrary to or an unreasonable applica-

tion of clearly established federal law, nor did he allege that the state court's decision

was based on an unreasonable determination of the facts in light of the evidence pre-

sented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).  Only after the State

filed its answer did Hidou reply with new, specific arguments detailing the purported

unreasonableness of the appellate court's holdings.[5]

Hidou's reply brief consequently extends well beyond the scope of his original

petition to this Court and far past the State's Answer.  It is a well-settled principle,

however, that litigants forfeit those arguments raised for the first time in a reply

---

[4] In his original petition, after moving for discovery and an evidentiary hearing, Hidou moved "for leave to file a brief and memorandum of law in support of this petition as a reply to any answer filed by the Respondent that will outline the legal bases for why relief should be granted here because the state courts issued orders that are (1) contrary to and involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, and (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." (Dkt. 1 at 2.)

[5] For example, in his reply brief, Hidou argues that the appellate court unreasonably applied federal law in violation of § 2254(d)(1) because it did not address the "deficient performance" prong of *Strickland* in its analysis of Claims 2 and 3. (Dkt. 32 at 23, 27.)  Not only was this argument entirely absent from his petition, it demonstrates a clear misunderstanding and misstatement of federal law.  One need not look further than *Strickland* itself to know that this assertion is incorrect. Courts may deny ineffective assistance of counsel claims for lack of prejudice without ever addressing the question of counsel's actual performance.  *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"); *see also Taylor*, 569 at 748; *Berkey v. United States* 318 F.3d 768, 772 (7th Cir. 2003); *Matheney v. Anderson*, 253 F.3d 1025, 1042 (7th Cir. 2001).

brief. *See United States v. Cruse*, 805 F.3d 795, 817 n.7 (7th Cir. 2015) ("Arguments raised for the first time in a reply brief are waived."); *Narducci v. Moore*, 572 F.3d 313, (7th Cir. 2009) ("A district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *United States v. Stevens*, 380 F.3d 1021, 1025 (7th Cir. 2004) (describing a challenge brought for the first time in a reply brief as "too late"). A party's main argument must appear in the opening brief so that the opposing party has a fair opportunity to adequately respond. A litigant may not reserve her argument for reply.

Hidou's attempt to bifurcate his argument between the petition and the reply prejudiced the State, as it was not put on notice regarding the extent of his arguments and it did not have a fair chance to respond. By asserting that he was entitled to relief under § 2254(d) in his petition but not explaining why, Hidou called out but engaged in no analysis. If Hidou had filed his petition *pro se*, the Court would be more inclined to grant him leniency; however, Hidou has been represented by counsel every step of the way. Thus, for each of Hidou's remaining claims, the Court considers any aspect of the argument raised for the first time in his reply brief forfeited and accordingly declines to analyze them.

### A. Ineffective Assistance Claims 2, 3, and 4

Hidou presented Claims 2, 3, and 4 separately in his petition but noted that "the information and allegations contained [in the three claims] are related." (Dkt. 1 at 27, 29.) Cutting through Hidou's wordy descriptions for each of these three claims,

the essence of Hidou's allegations is that counsel was ineffective for failing to retain and consult with an expert witness. He argues that if counsel had hired an expert, he would not have stipulated to "false and misleading" information and would have challenged the qualifications of the state's medical experts. The state appellate court addressed each facet of this claim and reasonably found that Hidou had received effective assistance of counsel. Without evaluating the reasonableness of counsel's performance, the court properly focused its analysis on whether counsel's decision not to retain an expert witness prejudiced Hidou. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

### 1.     Failure to Retain a Defense Expert

Hidou's postconviction counsel hired a forensic pathologist, Dr. Michael Baden, to review the case. One of Dr. Baden's postconviction findings was that the paramedics who responded to the stabbing improperly intubated Moreno, which caused asphyxiation and removed "any possibility that Moreno had for survival." (Dkt. 5 at 291–93.) Hidou argues that if trial counsel had retained its own medical expert, he could have presented this "material and exculpatory" information to challenge Dr. Tera Jones's opinion as to the cause of death. *Id.* at 26.

The state appellate court applied Illinois tort law by acknowledging that gross negligence, such as improper intubation, can be a defense to murder, but found that such a defense was unavailable in Hidou's case. *People v. Hidou*, 2016 IL App (1st)

143903-U, ¶¶ 61–63. The court reasoned that Dr. Baden's report, even taken as true, did not establish that the legal cause of death was the paramedics' gross negligence because the report did not state that Moreno would have survived the eight stab wounds but for the improper intubation. *Id.* The court reasonably concluded that, because the evidence still supported a finding that Hidou's actions were likely to cause death and did cause Moreno's death, Hidou failed to show that the testimony of a defense expert, like Dr. Baden, would have changed the trial's result.

### 2. Failure to Challenge State's Expert's Qualifications

Similarly, Hidou argues that counsel was ineffective for failing to challenge Dr. Tera Jones's qualifications as an expert witness. Hidou again cited Dr. Baden's affidavit asserting that Dr. Jones was not a board-certified forensic pathologist at the time she performed an unsupervised autopsy of Moreno. (Dkt. 5 at 291–93.) The last state court to adjudicate this claim was the postconviction trial court, which rejected it and held that Dr. Jones was qualified to testify about Moreno's injuries and cause of death.

In general, whether an expert is qualified to testify about a matter is a question of state evidentiary law. *See Buie v. McAdory*, 341 F.3d 623, 625 (7th Cir. 2003). Thus, there is no clearly established federal law to question. *See King v. Pfister*, 834 F.3d 808, 814 (7th Cir. 2016) ("It is well-established that on habeas review, a federal court cannot disagree with a state court's resolution of an issue of state law."). Moreover, the trial court found that Hidou's trial counsel did object to at least one question

on the topic of Dr. Jones's expert qualifications and the court overruled it. As the state court properly observed, a defendant does not receive ineffective assistance of counsel for failure to object where an objection would have been overruled. *People v. Hidou*, 2013 IL App (1st) 103511-U ¶ 60 (citing *People v. Bean*, 560 N.E.2d 258, 288 (Ill. 1990)).

### 3. Stipulation to State's Expert's Medical Report

Hidou also used Dr. Braden's findings to argue that if counsel had retained an expert to review the medical records, he would not have stipulated to the "damaging evidence" taken from Dr. Ron's report about Hidou's injuries. Hidou asserted that the stipulation downplayed and mischaracterized Hidou's injuries from his altercation with Moreno and offered Dr. Braden's affidavit as evidence that Hidou's injuries corroborated his testimony that Moreno was the aggressor and Hidou acted in self-defense.

For example, Dr. Braden noted that the parties' stipulation described a "six centimeter scalp hematoma at the left vertex" meaning the *top of the head*, but Dr. Ron's actual report from the night of states that it was at the "left posterior occiput," or the *back* of the head, which is more consistent with Hidou's statement that he fell backward and lost consciousness. (Dkt. 5 at 289.) Dr. Braden also noted that the stipulation failed to mention Hidou's abrasions on his knees, or the swelling in his elbow and ear, all of which Dr. Ron detailed in his hospital report. *Id.*

The appellate court found that the information Dr. Braden provided would not have changed the outcome of the trial because trial counsel merely stipulated that, if called, Dr. Ron would have testified to the information in the medical report from the night Hidou's injuries were diagnosed at the hospital. *People v. Hidou*, 2016 IL App (1st) 143903-U, ¶ 60. The court emphasized that Hidou did not "argue that trail counsel should have *called* an expert witness, such as Dr. Baden, at trial. Rather, he [used] Dr. Baden's report to introduce an alternate medical opinion regarding [Hidou's] injuries." *Id.* (emphasis added).[6]

---

[6] Although the appellate court's statement that Hidou never argued that counsel should have called an expert witness is not entirely accurate, its conclusion that counsel's stipulation to Dr. Ron's testimony did not prejudice Hidou was still reasonable. Hidou did argue in his postconviction petition that "counsel had ample resources to consult with and *present the testimony of* their own forensic pathologist." (Dkt. 5 at 251 (emphasis added).) But again, the problem is that Hidou changed the exact nature of his ineffective assistance claims each step of the postconviction process, leaving a confusing web of overlapping arguments for courts to sort through. Hidou phrased his claim related to Dr. Ron's testimony as "stipulating to false and misleading information" and mentioned nothing about counsel's failure to call an expert at trial. *Id.* at 250. Hidou did *not* argue that trial counsel should have presented the testimony of a forensic pathologist until his next, separate claim of ineffective assistance, "failure to investigate, challenge, and effectively cross-examine the background, qualifications, and opinions of Dr. Tera Jones." *Id.* Given that Hidou buried this assertion in one sentence within a seventy-nine-page brief, it is understandable that the appellate court may have overlooked the exact parameters of his argument.

Further, in its answer to Hidou's habeas petition, the State argues that because Hidou did not argue in state court that counsel should have called a medical expert to present an alternative opinion, any such claim must be procedurally defaulted on federal habeas review. When considering whether a petitioner who has reformulated his claims fairly presented them to a state court, a federal court's "overall task is to determine in practical terms whether the state courts were sufficiently alerted to the nature of [the petitioner's] federal constitutional claim." *Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) (internal citation omitted). Here, the state court reasonably understood Hidou's argument to be that if counsel had retained an expert witness, counsel would not have stipulated to Dr. Ron's report. Nothing in the record, however, indicates that Hidou sufficiently alerted the state court to the iteration of the claim he now puts forward: that counsel should have called an expert witness to the stand to present an alternative medical opinion at trial. Stipulations and testimony are different forms of evidence. Therefore, Hidou procedurally defaulted this aspect of his claim, which keeps this Court from reviewing its merits.

Moreover, Hidou argues that his real injuries, as opposed to the "false and mis-leading ones stipulated to," support his theory of self-defense. Hidou's challenge at trial, however, was not to the lack of evidence of his injuries, but rather the fact that those injuries were consistent with both his and Latson's descriptions of the fight. The judge heard ample testimony about the injuries that Hidou sustained, including that his eyes were badly swollen (Dkt. 4 at 346); that he had "blood everywhere" and it was coming from his nose, hands, and arm (Dkt. 6 at 351); and that he was having trouble staying conscious (Dkt. 4 at 18).

None of this testimony, nor any evidence contained in Dr. Ron's report, could clarify the critical questions of whether Hidou sustained his injuries before or after he stabbed Moreno eight times or who initiated the fight. Accordingly, counsel's choice to stipulate to Dr. Ron's report instead of cross-examining him about the na-ture of Hidou's injuries was reasonable and did not alter the ultimate result of the case. Because the state court reasonably applied *Strickland* and concluded that coun-sel's decision not to retain a medical expert witness did not rise to the level of ineffec-tive assistance under the Sixth Amendment, Claims 2, 3, and 4 fail.

### B. Ineffective Assistance Claims 5 and 17—Stipulating to Incrimi-nating Evidence and Failing to Call Nisan

Hidou argues that counsel should not have stipulated to Dr. Ron's testimony that Hidou used a fake name and birthday when he arrived at the hospital and in-stead should have called George Nissan to explain that Nissan was the one who pro-vided the incorrect name and birthday, not Hidou. Hidou attached an affidavit from

Nissan to his postconviction petition where Nissan stated that he provided the name "Ashy Hidi" because "'Ashy' was petitioner's nickname and 'Hidi' is the phonetic spelling of Hidou." (Dkt. 5 at 336–37.) The affidavit further reported that Nissan accidentally misstated Hidou's birthday because, although he knew Hidou's birth month and day, he did not know the year. *Id.*

The state appellate court acknowledged that Nissan's testimony would have clarified who provided the false information at the hospital, but ultimately decided it had nothing to do with how the fight occurred, which was the critical issue in the trial. *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 53. Additionally, even if Nissan's testimony could have marginally bolstered Hidou's credibility before the court, counsel's decision not to call Nissan was reasonable trial strategy given that Nissan was a problematic witness—when the police came to his home to arrest Hidou, he initially refused to cooperate with them. *Id.* ¶ 55. Because the court properly applied *Strickland* to Claim 5 and reasonably held that counsel's failure to call Nisan to contradict Dr. Ron's stipulated testimony was neither deficient nor prejudicial, Claim 5 does not entitle Hidou to relief.

## C.   Ineffective Assistance Claim 6 and Claim 17--Intimidation and Failure to Call Numerous Witnesses

Hidou contends that he did not receive effective assistance of counsel because counsel failed to call "numerous witnesses" and introduce other evidence that would have corroborated Hidou's testimony and his theory of self-defense. These "numerous

witnesses" include Hidou's neighbor, Sal Chavez; Hidou's friend, Jessica Cisneros; and Hidou's sisters, Marlene Khoshaba and Maureen Aguilar.

The appellate court noted that the decision whether to call a witness is generally a matter of trial strategy. *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 40 (citing *People v. Munson*, 794 N.E.2d 155, 175 (Ill. 2002)). The court also explained that decisions regarding cross-examination and impeachment are discretionary and do not usually support claims of ineffective assistance. *Id.* (citing *People v. Johnson*, 2015 IL App (3d) 130610, ¶ 31)). Because reasonable, discretionary decisions related to trial strategy are not indicative of deficient performance under *Strickland* step one, the court held that trial counsel's choice not to call these witnesses was reasonable. *Id.* ¶ 40. Additionally, the court found that even if counsel's decision fell outside the scope of reasonable professional judgment, Hidou could not show that failing to call the witnesses resulted in prejudice, as required under *Strickland* step two. *Id.* ¶ 57.

### 1.    Sal Chavez

The court rejected Hidou's claim that counsel was ineffective because he did not call a neighborhood boy named Sal Chavez to testify. *Id.* Hidou insists that counsel could have used Chavez's testimony to impeach Maldonado and Latson by describing how they appeared intoxicated at the time of the fight and that they each had a reputation for fighting and gangbanging. But the appellate court correctly found that nothing in Chavez's proposed testimony would have changed the outcome of the trial. *Id.*

For instance, Chavez's statements that "Latson was an accomplished, amateur mixed martial arts fighter" would not have shown that Hidou reasonably believed he needed to defend himself from Latson because Hidou himself testified at trial that he did not know of Latson or his reputation at the time of the fight. *Id.* ¶ 42. As to Hidou's argument that Chavez's testimony could have attacked Moreno's credibility, the trial court had already heard testimony about Moreno's violent nature, intoxication, and gang affiliation. *Id.* ¶ 43. Finally, even though Chavez had witnessed part of the fight between Hidou and Moreno, his proposed testimony would not have established that Moreno was the initial aggressor, which was the key to counsel's defense strategy. *Id.* The appellate court reasonably analyzed the proposed testimony and properly applied *Strickland* to rule that trail counsel was neither deficient nor prejudicial in choosing not to call Chavez to testify.

### 2. Jessica Cisneros

Hidou next maintains that that counsel was ineffective for failing to call Jessica Cisneros because she would have corroborated his version of events. Cisneros's affidavit states that she was on the phone with Hidou as he was walking from the Claudio home toward a convenience store where his sister would pick him up. (Dkt. 5 at 342.) Cisneros attests that Hidou said "uh oh, [Moreno's] out here," and then the call dropped. *Id.* at 343.

Hidou posits that Cisneros would have been a "key witness for the defense," but the appellate court disagreed, holding that her testimony was cumulative and

"actually help[ed] establish that defendant's sister did not come pick him up and that defendant started walking toward [Moreno]." *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 46. Further, Cisneros's testimony would have contradicted Hidou's testimony in numerous other ways, including undermining his statement at trial that he "was reaching for [his] phone to call [his] sister" when he first saw Moreno and Latson. (Dkt. 4 at 172.) The court also noted that this testimony would not help clarify whether Hidou was the initial aggressor; thus, counsel's decision not to call him was reasonable trial strategy. *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 46. The court properly determined that, because Hidou could not demonstrate deficient performance or prejudice stemming from counsel's strategy not to call Cisneros, he could not show that he received ineffective assistance.

### 3.    Khoshaba and Aguilar

Hidou also claims that counsel was deficient for failing to call his sisters, Maureen Aguilar and Marlene Khoshaba. He argued that each sister could have offered testimony to corroborate his own testimony and make him appear more credible. The appellate court found that because the proposed testimony would have been cumulative at best—and potentially damaging at worst—it was reasonable for counsel not to call the sisters as witnesses. *Id.* ¶¶ 47–51.

Khoshaba signed an affidavit asserting that either her or her sister routinely picked Hidou up from the Claudio home and that she was planning on picking Hidou up the night of the fight, but she fell asleep and missed his call. (Dkt. 5 at 332.) The

court held that because her offered testimony would merely establish that she ultimately did not pick Hidou up that night, it did not exculpate him, and it was reasonable for counsel not to call her as a witness. *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 51.

In response to this point, Hidou argues that the value in Khoshaba's testimony would have been to establish that Hidou did not leave the Claudio residence to fight with or injure Moreno, but instead because he believed that his sister would be there to pick him up. Even if counsel had called Khoshaba and elicited this testimony, it is still unreasonable to assert that the result of the trial would have been different. The trier of fact still heard evidence that established that Hidou confronted Moreno in the street with a deadly weapon, stabbed him eight times, and then fled the scene. *People v. Hidou*, 2013 IL App (1st) 103511-U ¶ 70. Given the doubly deferential standard the Court applies, the appellate court reasonably ruled that counsel's decision to not call Khoshaba was neither deficient performance nor prejudicial.

Similarly, Hidou asserts that counsel should have called Hidou's other sister, Maureen Aguilar, to provide evidence that she had purchased the knife for Hidou as a gift because they both collected souvenir knives. As the appellate court reasonably noted, this would have contradicted Hidou's trial theory that he had purchased the knife to protect himself because he felt threatened by gang members in the area. *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 49. Because Aguilar's proposed testimony would have undermined Hidou's credibility on the stand and damaged the

defense's theory of the case, the appellate court was correct to find that counsel's decision not to call Aguilar was reasonable.

Pivoting to Claim 17, Hidou stated in his petition for a writ of habeas corpus that counsel intimidated witnesses into not testifying. Hidou did not present this as a separate claim to the state court,[7] but both of Hidou's sisters disclosed that counsel urged them not to testify for safety reasons in their affidavits. (Dkt. 5 at 328, 334.) In its ineffective assistance analysis of Hidou's failure to present witnesses claim, the state court did not address this issue and instead focused its reasoning on whether the sisters' testimony would have changed the outcome of the trial. *See People v. Hidou*, 2016 IL App (1st) 143903-U ¶¶ 47–51.

When applying § 2254(d) to an argument not explicitly addressed in the state court's opinion, "a habeas court must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Lee*, 871 F.3d at 572 (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Here, the Court presumes that if the state court had specifically applied *Strickland* to Hidou's assertions in Claim 17, its analysis and results would have been the same: Hidou still would have been unable to show that counsel's "intimidation" of his sisters by encouraging them not to testify prejudiced his case because nothing in their

---

[7] Because Hidou did not clearly present this claim to the state court, one could argue that he procedurally defaulted the claim. Procedural default, however, is "an affirmative defense that the State is obligated to raise and preserve, and consequently one that it can waive." *Briley*, 390 F.3d at 515. Thus, the Court analyzes the claim on its merits.

proposed testimony would have changed its outcome. Considering the indistinct nature of this claim, the appellate court's decision regarding Hidou's sisters' testimony can hardly be characterized as erroneous, much less an error so clear as to go beyond any possibility of fair-minded disagreement. The decision was justified under either step of the *Strickland* formula: there was neither deficient performance nor prejudice.

### D. Claim 15: Failure to Effectively Confront and Cross-examine Maldonado

Claim 15 is closely related to Claim 6 because Hidou argues that counsel violated his Sixth Amendment rights by failing to call witnesses, like Chavez and Cisneros, to impeach Maldonado on his gang membership, character for violence, intoxication, and ability to perceive and hear on the night in question. Hidou also urges that counsel should have confronted and cross-examined Maldonado about his prior inconsistent statements to the police.

The appellate court rejected these contentions because each constitutes reasonable trial strategy within the wide range of professionally competent assistance under the first prong of *Strickland*. Even though Hidou maintains that he was not a gang member, both Vanessa and her brother testified that he was. *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 43. Thus, because gang evidence applied to both parties, it was a valid defense strategy to minimize gang references in the trial by not presenting evidence of Maldonado's alleged gang membership. *Id.* Moreover, the appellate court found that testimony from Chavez or Cisneros asserting that Maldonado was intoxicated would have been cumulative. The trial court was already aware

that Maldonado had been drinking alcohol on the night in question because Maldonado himself testified that he had consumed "three beers and a cup of vodka" before the stabbing. *Id.* Additionally, the appellate court rejected the proposed evidence in Cisnero's affidavit of Maldonado's alleged hearing and vision problems as unreliable hearsay evidence. *See id.* at 45.

The appellate court's analysis of each contention was a reasonable application of *Strickland* and its conclusion that counsel was not ineffective for failing to impeach Maldonado on these points stands as an appropriate conclusion. The record itself bolsters the appellate court's decision as it reflects counsel's strategy to elicit useful testimony from Maldonado instead of impeaching him. For example, Maldonado testified on cross-examination that Hidou was not in Vanessa's bedroom when Moreno called for her, which corroborated Hidou's testimony that he did not hear Moreno outside. (Dkt. 6 at 343.) Further, Hidou has repeatedly argued that the trial court did not receive adequate evidence about his injuries, but it was Maldonado who testified that after the stabbing, Hidou had "blood everywhere . . . coming from his nose, from his hands, and from his arms." *Id.* at 351. Thus, the appellate court's rejection of Claim 15 was a reasonable application of *Strickland*.

### E.    The Totality of the Evidence

Finally, it is important to note that while Hidou identified seventeen separate instances of alleged ineffective assistance of counsel and framed each instance as its own claim, "a court hearing an ineffectiveness claim must consider the totality of the

evidence before the judge or jury." *Strickland*, 466 U.S. at 669. The state court addressed each claim individually, and after properly applying the *Strickland* analysis, concluded that Hidou was unable to demonstrate ineffective assistance of counsel.

Taking a step back and looking at the "entire evidentiary picture" as *Strickland* instructs, the appellate court's determination that none of Hidou's claims overcame *Strickland*'s strong presumption was right because counsel exercised sound professional judgement. *Id.* Although it is tempting to look back at counsel's performance and ask whether a different strategy might have been better, *Strickland* calls for "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 110 (internal citation omitted). Even if hindsight reveals that counsel's strategic decisions not to call certain witnesses or to stipulate to certain medical information did not lead to the result that Hidou hoped for, that does not show that counsel was objectively incompetent. The appellate court properly found the record to reveal that counsel put on a robust—albeit unsuccessful—defense of Hidou, and his strategic decisions throughout the trial were reasonable.

Moreover, considering all the circumstances, the appellate court correctly applied *Strickland*'s prejudice prong and held that Hidou was not able to show that, but for counsel's alleged errors, the result of the proceeding would have been different. The court noted that there was "overwhelming evidence" to convict Hidou of first-degree murder at the trial level, including that Hidou: (1) had animosity toward [Moreno]; (2) armed himself with a deadly weapon; (3) stated he was going 'to get'

[Moreno]; (4) sought out [Moreno]; (5) approached [Moreno] from behind as he was walking away; (6) confronted [Moreno] with a deadly weapon; (7) yelled out hateful comments during the attack and declared allegiance to his gang; (8) stabbed [Moreno] three times in the chest and five times in the back, penetrating the heart; (9) fled the scene; and (10) failed to make a police report. *People v. Hidou*, 2016 IL App (1st) 143903-U ¶ 70.

Looking beyond the trial evidence, the court also recognized that none of the new evidence Hidou presented on collateral attack would have changed the outcome of the trial. *Id.* ¶ 57. Given that much of this case centered around the issue of provocation and determining who was the initial aggressor, the appellate court reasonably focused its analysis on the fact that none of the new proposed evidence would establish what occurred immediately before the confrontation between Hidou and Moreno.

## III.   Evidentiary Hearing

Hidou also requested an evidentiary hearing. Because federal habeas courts are not an alternative forum for trying issues and facts that a petitioner did not pursue at the state court level, the AEDPA precludes an evidentiary hearing or an expansion of the record in support of a habeas corpus petition if the petitioner failed to develop the factual basis for his claim in state court. 28 U.S.C. § 2254(e)(2). A petitioner's failure to develop the factual basis of his habeas claim in state court bars a hearing or expansion of the record if the failure was due to "a lack of diligence, or

some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432.

Under § 2254(e)(2), diligence depends upon whether the prisoner made a reasonable attempt to investigate and pursue claims in state court and requires, at a minimum, that the prisoner sought an evidentiary hearing in state court in the manner prescribed by state law. *See id.* at 435. In this case, Hidou sought an evidentiary hearing from both the circuit court and the appellate courts in his postconviction proceedings and the state courts denied his requests. Because Hidou attempted to further develop the factual basis of his claims in state court, § 2254(e)(2) does not apply.

Where § 2254(e)(2) does not apply, a court must evaluate the request for an evidentiary hearing under pre-AEDPA standards. *Avila v. Richardson*, 751 F.3d 534, 537 (7th Cir. 2014). Under pre-AEDPA standards, a federal evidentiary hearing is required only if: (1) the petitioner alleges facts which, if proven, would entitle him to relief; and (2) the state courts, for reasons beyond the control of the petitioner, never afforded the petitioner a full and fair hearing. *Id.*

Applying this pre-AEDPA standard to Hidou's case, he fails to show that he is entitled to an evidentiary hearing because the facts alleged would not grant him habeas relief. Hidou asserts that an evidentiary hearing would provide the Court with more information than that contained in the written record, so it could better evaluate his claims. But that is true with every § 2254 petition and Hidou does nothing to set himself apart. The Court of course thoroughly reviewed the record, including the affidavits from proposed witnesses and experts, and concludes that an evidentiary

hearing is unnecessary to evaluate Hidou's claims. As previously decided, none of Hidou's proposed evidence would objectively demonstrate that Hidou received ineffective assistance of counsel.

This conclusion is like that reached in *Davis v. Lambert*, where the prisoner requested an evidentiary hearing regarding his ineffective assistance claim that his attorneys failed to investigate any of the seven potential defense witnesses that he identified. 388 F.3d 1052, 1060 (7th Cir. 2004). For reasons outside of his control, the prisoner had been unable to obtain affidavits from any of the seven witnesses describing their anticipated testimony. *Id.* at 1060–61. The court emphasized that the record was "devoid of the kind of information about the potential testimony of the defense witnesses" that it would need to properly assess the conclusions of the Illinois courts under the *Strickland* standards. *Id.* at 1060. The court specifically reasoned that it could not properly review the Illinois Courts' determination that Davis did not suffer prejudice due to his counsel's failure to investigate these potential witnesses without knowing the content of their testimony. *Id.* at 1059.

In contrast to *Davis*, the Court here has access to affidavits from each proposed witness that explain, in detail, the content of their testimony. (Dkt. 5 at 319–375.) The Court also has access to an affidavit from Dr. Baden, which lays out his alternative medical opinions related to Claims 2–4. *Id.* at 287–293. Given the depth of the factual record presented for review, the Court need not hold an evidentiary hearing to rule on Hidou's petition, as he did not allege facts that would entitle him to relief.

## CONCLUSION

Because Hidou procedurally defaulted thirteen claims and failed to show that the state court's adjudication of his remaining seven claims was contrary to or an unreasonable application of clearly established federal law, the Court denies his petition for a writ of habeas corpus (Dkt. 1). The Court also denies Hidou's request for an evidentiary hearing (Dkt. 1) because Hidou has not alleged facts that, if true, would entitle him to relief. Finally, the Court declines to issue a certificate of appealability because Hidou failed to make a "substantial showing of the denial of a constitutional right," or in other words, demonstrate that reasonable jurists could debate this Court's resolution of Hidou's petition. 28 U.S.C. § 2253(c)(2); *see Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

Virginia M. Kendall
United States District Judge

Date: July 2, 2019